IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 5, 2014

**STEVEN MALONE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 07-05771    Paula Skahan, Judge**

**No. W2013-00683-CCA-R3-PC  - Filed May 7, 2014**

The petitioner, Steven Malone, appeals the denial of his petition for post-conviction relief arguing that he received ineffective assistance of counsel pretrial and at trial. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Warren P. Campbell, Memphis, Tennessee, for the appellant, Steven Malone.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Marquis Young, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The petitioner was convicted of second degree murder and aggravated assault as a result of his involvement in the gunshot killing of William Craig, Jr., on December 20, 2006, for which he was sentenced to an effective term of twenty-five years. State v. Steven Malone, No. W2010-00947-CCA-R3-CD, 2011 WL 3912935, at *1 (Tenn. Crim. App. Sept. 7, 2011), perm. app. denied (Tenn. Jan. 10, 2012).

This court recited the underlying facts of the case on direct appeal as follows:

On December 19, 2006, the victim, Bobby Craig, lived with his parents

and his seventeen-year old daughter, Sarah, in Erin. He had lived there for the previous three weeks after moving from Memphis. When the victim left Erin the morning of December 19, he hugged his daughter and drove his father's red Ford pick-up truck to Memphis. He told Sarah that he was going to help the police in Memphis, retrieve his gray Dodge pick-up, and bring her sisters, who lived in North Mississippi, home for Christmas. At 5:25 a.m. on December 20, the victim called Sarah; he told her that he had the key to his truck and was waiting "outside of a boy's house" for someone to come pick it up. He told her several times that he loved her and abruptly hung up saying, "Shit, I've got to go."

The previous evening, the victim had worked with Sergeant Clay Aitken of the Shelby County Sheriff's Department as a confidential informant on a burglary investigation. When Sgt. Aitken noticed that the victim was not driving his usual gray Dodge pick-up truck but rather a red Ford extended-cab pick-up truck, the victim told him that the red truck belonged to his father. The investigation ended around 9:00 p.m. on December 19 with the arrest of the burglary suspect, and the victim and Sgt. Aitken parted ways. When Sgt. Aitken checked his cell phone the next morning around 8:00, he saw several missed calls from the victim between 6:00 and 6:30 a.m. After one call, the victim left a voice mail message saying, "Call me. I need your help." Sergeant Aitken tried unsuccessfully several times to contact the victim over the course of the morning.

Sergeant Aitken first met the victim in mid-2006 when he was a detective assigned to the "ALERT" squad of the Shelby County Sheriff's Department, which primarily conducted undercover investigations of property crimes. During an unrelated traffic stop of the victim, the victim told the patrol officer that he had some helpful information for law enforcement. The patrol officer recognized that the information could be used by the ALERT squad and contacted Sgt. Aitken. The victim met with Sgt. Aitken and conveyed information about a stolen vehicle. He told Sgt. Aitken that he had "personal issues with drugs" and wanted to get away from that lifestyle and redeem himself with his family. The victim subsequently worked as a confidential informant with the sheriff's department.

On the morning of December 20, Dennis Elam was driving to work. When he stopped at the intersection of Carrolton and Benjestown Roads in Shelby County around 6:00 a.m., he noticed a red Ford pick-up truck approaching from the left and heading toward the dead-end portion of

Benjestown Road. The driver was a "white male[,] about forty" and the front passenger was an African-American male. He noticed a passenger in the rear seat of the extended cab but could not determine any details about his or her appearance. After Elam turned in the opposite direction, he looked in his rearview mirror and saw the red truck turn into the driveway of an abandoned house at the end of Benjestown Road.

Around 11:00 a.m. on December 20, Memphis Light, Gas, and Water foreman David Quinn was in the area of Carrolton and Benjestown Roads conducting "re-reads" on meters. He drove down the driveway of an abandoned house at the end of Benjestown Road to relieve himself. As he approached the house, he saw the body of a white male on the left side of the driveway. After confirming that the man was dead, Quinn used his walkie-talkie to call the company's dispatch about the situation. Law enforcement was then called to the scene.

Shelby County Sheriff's Department Lieutenant John Mills was called to the scene on Benjestown Road to supervise the collection of evidence. He found the victim's body about half-way down the driveway leading to an abandoned house. A black baseball cap and a pink cell phone were near the body, which was surrounded by shattered glass from a vehicle window. Lieutenant Mills collected seven shell casings near the body – four .40 caliber shells and three nine millimeter (9 mm) shells. He noticed a large area of blood on the ground next to the body and some leaves stuck to the victim's face. From this evidence, as well as the positioning of the victim's legs, Lt. Mills concluded that the victim had originally fallen face down and had been turned over before the police arrived.

Earlier that morning, Louis Patterson was in bed when he heard a noise behind his house near the boat ramp to Sky Lake, but he did not get up to investigate the noise. As he was getting dressed, he looked out the bathroom window and saw a red pick-up truck partially submerged in the lake with its rear wheels spinning. When he went outside to warm up his vehicle, he saw what he thought was an olive-colored, two-toned pick-up truck with a blue tailgate parked diagonally across the street from his house. He saw an African-American male get out of the passenger's side of the truck and walk around to the driver's side. The man then walked down the boat ramp. He went back inside to finish his preparations for work and heard more commotion outside. He went outside again, and the red truck was further submerged in the lake, but he saw no one near the truck. He then saw two men

-3-

coming up the boat ramp; one appeared to be the same man he saw earlier, and the other was another African-American. He believed that they saw him because they turned their faces away from him. The two men walked past the pick-up truck parked on the street. Mr. Patterson then left for work but returned shortly thereafter because he had forgotten his lunch. The olive-colored pick-up truck was gone. He then instructed his girlfriend to call the police and report the vehicle in the lake.

Around midday on December 20, Sgt. Aitken received a call from a detective in the homicide division of the sheriff's department advising him that Bobby Craig had been "the victim of a homicide." Sergeant Aitken drove to the crime scene and identified the victim, who had been shot several times. Because of his close ties to and recent contact with the victim, Sgt. Aitken participated in the murder investigation. Along with other officers, he began looking for the victim's gray Dodge pick-up truck and the red Ford pick-up truck he had been driving the night before. The red Ford pick-up was subsequently found partially submerged in Sky Lake.

Willie Wells with Downs Wrecker Service was dispatched shortly after noon on December 20 to pull the red Ford pick-up out of Sky Lake. Wells found the truck partially submerged with the engine still running and the transmission in drive; the rear wheels were spinning. After Wells pulled the truck out of the lake, he noticed two bricks against the gas pedal, what he thought was human flesh on the steering wheel, and a bullet casing on the floor. He also noticed a bullet hole in the left door panel and a shattered left window. At that point, he told the officers present that he could not tow the vehicle because it appeared to be a crime scene. Once the Shelby County Sheriff's Department took possession of the truck, Wells towed it to the sheriff's department crime scene investigation center.

Around 6 p.m. on December 20, Shelby County Sheriff's Lt. Philip Peterson stopped Mardacy Greer driving a gray Dodge pick-up truck. After Greer was taken into custody, the [petitioner] became a suspect in the victim's murder. The [petitioner] was eventually found later that evening hiding under a bed at his sister's apartment and was apprehended with the use of a K-9 officer. Sergeant Chris Harris transported the [petitioner] to The MED for treatment of a dog bite wound sustained during his arrest. After he was treated and released, Sgt. Harris bought food for both himself and the [petitioner] and took him to the criminal justice center in Memphis for questioning.

Sergeant Harris advised the [petitioner] of his Miranda rights, and the [petitioner] signed a waiver of those rights. The [petitioner] admitted to Sgt. Harris that he "rented" the victim's Dodge truck by giving him money and crack cocaine in exchange for the use of the truck. He said that, in the early morning hours of December 20, the victim came to his house to retrieve his truck, but then said he would sell it to the [petitioner] for "[a] little hundred and these four rocks." The [petitioner] did not have any crack cocaine to sell to the victim, so they drove a red Ford pick-up truck to Mardacy Greer's house to get the crack cocaine. Greer got into the rear of the red Ford pick-up and directed the victim to drive to his "trap house" on Benjestown Road, where he stored and sold drugs.

When they arrived at the house, Greer got out of the truck and walked toward the house. The victim was impatient and thought they did not have any drugs for him. Greer then walked back to the truck, asking again what the victim wanted. At this point, the victim became suspicious that something was going on. Greer pulled out a gun and shot the victim several times. The [petitioner] also fired on the victim. Greer then pulled the victim out of the truck and shot him in the head because he was still moving. After Greer rolled the victim over, the [petitioner] retrieved the key to the Dodge pick-up from the victim's pocket. The [petitioner] and Greer then drove to the [petitioner]'s house, got the Dodge pick-up, and drove both trucks to Sky Lake where Greer put bricks on the accelerator of the Ford. They then rolled the truck into the lake.

The [petitioner] testified at trial similarly to the statement he gave to Sgt. Harris. He testified that he sold crack cocaine to the victim several times in 2006 and that the victim "rented" his Dodge truck to him in exchange for drugs. He stated that, sometime in November 2006, the victim left the truck with him and did not return to claim it. The victim did not contact him again[] until December 20, when he showed up at the [petitioner]'s house in the early morning hou[rs] to retrieve his truck. The [petitioner] testified that he gave the truck key back to the victim but that the victim changed his mind and decided to buy more drugs. They then drove to Greer's house in the red Ford pick-up to get more drugs. Greer directed them to another location on Benjestown Road to get the drugs. The [petitioner] stated that he and Greer both got out of the truck at the house and that Greer walked behind the house as if he was going to get the drugs. When Greer returned, the [petitioner] heard the "gas growl" on the truck and the pop of gunfire. He stated that his first reaction was to reach for his gun, a Glock .40 caliber pistol, and that he fired several

shots at the victim. He testified that he stopped shooting because he did not know why he was shooting in the first place. When the shooting stopped altogether, Greer pulled the victim out of the truck, flipped him over, and told the [petitioner] to get the key to the Dodge out of the victim's pocket. After they got to Sky Lake, he gave some bricks to Greer, which Greer placed in the truck, and together they pushed the truck into Sky Lake.

The [petitioner]'s girlfriend, Brittany Evans, testified that the [petitioner] sold crack cocaine. In late 2006, the [petitioner] and Greer shared possession of a gray Dodge pick-up truck that the [petitioner] had obtained from a "cone" – someone who trades or pawns property for drugs. She knew the "cone" was a middle-aged white man. On December 19, 2006, the [petitioner] came to her house and stayed until the early morning hours of December 20. Around 4:00 a.m., she called the [petitioner] at his mother's house. While they were talking, the [petitioner] said that the man who owned the truck was there and wanted more drugs for the truck. She heard the [petitioner] say that he did not have any drugs but that he would call Greer on a three-way call while he was still on the phone with Evans. Greer did not answer the phone. Later that afternoon, the [petitioner] called Evans to say that Greer had been arrested. Shortly thereafter, officers arrived at Evans' house looking for the [petitioner]. The [petitioner] called her approximately forty-five minutes later, and she kept him on the phone while officers located the [petitioner] at his mother's house.

Shelby County Sheriff's Sergeant Ray Sides photographed and examined both the gray Dodge and red Ford pick-up trucks after they were delivered to the crime scene investigation center. Under the armrest of the Dodge, Sgt. Sides found a Hi-Point 9 mm pistol and a Christmas card addressed to "Miss Brittany." The pistol held four live rounds in the clip, but was capable of holding eleven to twelve rounds.

In the red Ford truck, Sgt. Sides found two bullet holes in the driver's side door. The driver's side window was completely shattered. He also found five spent shells in the truck: one on the floor, one in the driver's door handle, two inside the driver's door panel, and one under the driver's seat. He found two bricks and a shoe near the accelerator and another shoe in the back seat. He noticed a large blood stain on the driver's seat and blood spatter throughout the cab, including on the center console and on the passenger's seat. He also found a piece of human tissue on the steering wheel. Behind the driver's seat, he found a bloody tie-down strap. He also located a Christmas present behind

the passenger's seat addressed to "Maddy" from "Grandma and Paw Paw Craig."

After the red Ford was processed, it was returned to the victim's father, William Craig, Sr. In the process of cleaning the truck in early 2007, Mr. Craig found a shell casing in the pocket of the passenger's side door. He put the casing in a bag and delivered it to Sgt. Robert Butterick, who was the case officer on the murder investigation. On February 7, 2007, Sgt. Butterick tagged the 9 mm shell casing he had received from Mr. Craig several weeks earlier. Sergeant Butterick submitted all of the ballistics evidence collected during the investigation, including the newly-found shell casing, to the Tennessee Bureau of Investigation ("TBI") for analysis. Sgt. Butterick also prepared gunshot residue kits taken from the [petitioner], Greer, and the victim for analysis by the TBI.

TBI Special Agent Laura Hodge analyzed the gunshot residue kits collected from the [petitioner], Greer, and the victim. The results of the gunshot residue analysis were positive for residue on both Greer and the victim. She explained that residue could be present on a gunshot victim because residue comes from the end of the barrel when a gun is fired, therefore exposing the victim to residue. The results from the [petitioner]'s sample, taken sixteen hours after the incident, were inconclusive. However, due to the fragile nature of gunshot residue, she could not eliminate the possibility that the [petitioner] had fired, handled, or been near a gun when it was fired.

TBI Special Agent Don Carman examined the ballistics evidence submitted by Sgt. Butterick. He analyzed the 9 mm Hi-Point pistol and the 9 mm cartridges found in the gray Dodge pick-up truck; three 9 mm casings and four .40 caliber casings found at the crime scene; one 9 mm casing, two fired 9 mm bullets, two fired .40 caliber bullets, and a 9 mm bullet found in the red Ford pick-up truck; and one .40 caliber bullet found in the victim's body. Agent Carman concluded that the four 9 mm casings and the three 9 mm bullets were fired from the 9 mm Hi-Point pistol found in the Dodge pick-up truck. He also determined that the four .40 caliber casings were fired from the same weapon and that the three .40 caliber bullets bore the same rifling pattern. Agent Carman testified that the .40 caliber ammunition was consistent with having been fired from either a Glock-type or Smith and Wesson Sigma firearm.

Shelby County Assistant Medical Examiner Lisa Funte performed the

autopsy of the victim. She identified nine gunshot wounds, including three that were immediately fatal. She recovered a bullet from one of the fatal wounds and testified that the victim would have died if that had been the only gunshot wound he sustained. She was able to determine that the victim was shot from a distance of two to three feet and based on the trajectory and placement of the wounds, that the wounds were consistent with someone shooting the victim from the passenger's side of a vehicle. A post-mortem toxicology report indicated the presence of cocaine metabolites in the victim's blood, indicating that he ingested cocaine within a few hours of his death.

Id. at *1-6.

The petitioner filed a *pro se* petition for post-conviction relief on March 2, 2012, and, after the appointment of counsel, an amended petition was filed. The post-conviction court conducted an evidentiary hearing, at which the petitioner testified that he was originally represented by pretrial counsel. Pretrial counsel met with the petitioner "a couple of times" and filed a motion to suppress the petitioner's statement to police. The petitioner and Officer Harris testified at the hearing, and the motion was denied. The petitioner wanted his mother, sister and brother to testify at the suppression hearing. He said that his sister was present in the area that day, but he admitted that she was not inside the house when he was arrested. He claimed that he was struck by some officers while he was inside the apartment and handcuffed. The petitioner said that, to his knowledge, his sister did not give permission for the officers to enter her house. The petitioner stated that he was seventeen years old at the time of his arrest and that he asked to see his mother but was denied his request. He told pretrial counsel that he was treated at the hospital for injuries sustained during his arrest.

The petitioner testified that trial counsel took over representation of his case. Trial counsel consulted with him and developed a theory of defense that the shooting was the result of a "drug deal gone bad." The petitioner stated that trial counsel kept him updated about his case but did not discuss "all aspects of the case" with him. Asked what he would have wanted to know or request counsel to do, the petitioner said, "If I would of known I would of requested her to challenge . . . the process of my arrest being illegal." He admitted that he did not tell trial counsel about any possible witnesses to call to challenge the legality of his arrest.

The petitioner testified that he chose to testify at his trial because there were a lot of unexplained details in his statement to the police. He said that he would not have testified at trial had his statement been suppressed. The petitioner stated that he did not know that he could have had character witnesses testify for him at his sentencing hearing, and counsel did not explain enhancement and mitigating factors to him. He complained that trial counsel's

deficiencies resulted in his being sentenced as a violent offender.

On cross-examination, the petitioner admitted that members of his family were present during many of his court appearances and that pretrial counsel talked to them. He asserted that pretrial counsel should have presented witnesses at the suppression hearing to show that his statement was coerced because he did not have a parent present during the interrogation. The petitioner agreed that the majority of his trial testimony was very similar to what he said in his statement. In addition, the petitioner's girlfriend's testimony corroborated several points of his statement.

The petitioner's pretrial counsel testified that he represented the petitioner during the pretrial phase of the case, as part of which he filed a motion to suppress the petitioner's statement. He did not include an argument in his motion that the juvenile rules of procedure should have applied given the petitioner was seventeen years old at the time of his interrogation. Pretrial counsel's theory on the motion was that the petitioner's "will had been overborne because of what had happened to him when he was arrested[.]" Pretrial counsel requested the petitioner's medical records concerning the petitioner's treatment after his arrest but did not receive them before the hearing. Pretrial counsel said that he conducted an investigation prior to the hearing, which included speaking with the petitioner's mother, but he determined that the petitioner's mother could provide no relevant testimony at the suppression hearing. Accordingly, the petitioner was the only witness for the defense at the hearing. However, pretrial counsel acknowledged that, during the petitioner's interrogation, the petitioner's mother was at the police station and there "was some confusion as to whether she left or not while he was there," but he did not call her to testify. Pretrial counsel recalled that the petitioner was arrested at his sister's apartment without a warrant. However, he did not challenge the legality of the arrest in the suppression motion, explaining that "the whole focus of [his] motion was that [the petitioner's] will had been overborne[.]"

The petitioner's trial counsel testified that she was appointed to represent the petitioner at trial and on appeal after pretrial counsel had to withdraw due to a conflict. Pretrial counsel shared his file with trial counsel, and they discussed the "status and the position of the case[.]" Trial counsel met with the petitioner and developed a theory of defense that was "looking for voluntary manslaughter or something of that nature" given the content of the petitioner's statement to police. Trial counsel explained to the petitioner that he had the right to testify or not, and the petitioner made the choice to testify upon her advice that doing so could be beneficial because the State would be introducing his statement. Trial counsel said that she and her investigator met with the petitioner numerous times and that they interviewed witnesses and the petitioner's family members as well.

Trial counsel testified that she and the petitioner discussed the circumstances

surrounding his arrest, including that the petitioner was bitten by a canine released to retrieve him from the petitioner's sister's home. The petitioner's injuries were not life-threatening, and he was treated at the hospital before he was interrogated. She recalled that the petitioner alleged that the officers hit him on the head during his arrest, but trial counsel deferred to pretrial counsel for any details concerning that as "he was handling the case when that issue was really litigated." Trial counsel stated that she did not file a motion to suppress the petitioner's statement based on illegal arrest because one had already been litigated by pretrial counsel.

Trial counsel recalled that the petitioner's mother testified at trial but said that she had to defer to the trial transcript when asked whether trial counsel questioned the petitioner's mother about the petitioner's dealings with drugs and other illegal practices and that the petitioner's prior record came in through the petitioner's mother's testimony. Trial counsel acknowledged that the trial transcript reflected the trial court's ruling that trial counsel's direct examination of the petitioner's mother opened the door to allow the State to question the petitioner's mother about the petitioner's juvenile record. Trial counsel stated that she did not recall the petitioner requesting for any witnesses to testify at the sentencing hearing. Trial counsel recalled that she reviewed the presentence report and sentencing guidelines with the petitioner before the sentencing hearing.

Trial counsel testified that, on appeal, she did not raise an issue with the trial court's ruling on the suppression motion because the petitioner's "statement was not all bad. And it certainly supported our defense theory." She said that she "concentrated on the issues that [she] thought would be productive and those were the ones that were lodged on appeal." She also did not see "a strong reason to appeal" the trial court's sentencing decision.

The petitioner's mother, Vandellar Malone, testified that she was not present when the petitioner was arrested and that the police did not contact her after he was arrested. Ms. Malone said that she never made any statements to any officers that she was angry with the petitioner and wanted him to be arrested.

The petitioner's sister, Courtesia Gant, testified that the petitioner was arrested at her apartment. She said that the officers did not have permission to enter her apartment, elaborating that they knocked on the door and "when [she] pursued to open the door they bum rushed into [her] house with their big guns and everything else." The officers escorted her and her children outside. When the petitioner was brought outside, "his face was bleeding and they had put the dog on him[.]" Gant said that she saw an officer punch the petitioner in the face even though "he wasn't being resistant" and "was sitting down when they came." However, Gant admitted that she was outside when the petitioner was arrested and did not know what occurred inside the apartment. Gant stated that she would have

-10-

testified as a character witness for the petitioner had she been asked.

At a second hearing on this matter, the petitioner submitted as an exhibit the record of his medical treatment after his arrest. The court also heard arguments from the parties and took the matter under advisement. Thereafter, the post-conviction court entered a detailed order denying relief, and this appeal followed.

## ANALYSIS

On appeal, the petitioner raises various allegations of ineffective assistance of counsel. He asserts that he received ineffective assistance because pretrial counsel failed to call his mother and sister to testify at the motion to suppress; failed to subpoena and introduce his medical records at the motion to suppress; and failed to raise the issue of a warrantless arrest at the motion to suppress. He additionally asserts that he received ineffective assistance because trial counsel called a witness at trial who opened the door for the introduction of his prior juvenile record.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-convictions court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth

-11-

Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

We turn first to the petitioner's allegation that pretrial counsel was ineffective because he failed to call his mother and sister to testify at the motion to suppress. The petitioner asserts that his sister's testimony would have corroborated his testimony at the suppression hearing that he was beaten by the police when he was arrested. He asserts that his mother's testimony would have impeached the credibility of Sergeant Harris at the suppression hearing.

As to the petitioner's sister, the court found that she was outside the house when the petitioner's injuries occurred and would not have been able to testify as to what took place inside the house. The petitioner's sister initially testified at the post-conviction hearing that she saw an officer punch the petitioner in the face, but she later admitted that she was outside the apartment when the petitioner was arrested and did not see what happened inside the apartment. She only saw that the petitioner's face was bleeding when he was brought out. As such, the petitioner's sister's testimony would not have corroborated the petitioner's testimony at the suppression hearing; thus, the petitioner has failed to show any deficiency or prejudice.

As to the petitioner's mother, the court found that pretrial counsel made a strategic decision to not call her because he "did not believe she had anything worthwhile to contribute," and that the petitioner failed to show "how his mother's testimony at the motion hearing would have effected a different result." Pretrial counsel testified at the post-conviction hearing that he interviewed the petitioner's mother and concluded that she could provide no relevant testimony for the suppression hearing. Thus, pretrial counsel made a tactical decision based on adequate preparation that we will not second-guess. Moreover, the petitioner has failed to prove that there is a reasonable probability that the result of the proceeding would have been different considering that the same trial judge who presided over the suppression hearing heard the petitioner's mother's testimony at the post-conviction hearing and found that her testimony would not "have effected a different result."

With regard to the petitioner's allegation that pretrial counsel was ineffective because he failed to subpoena and introduce the petitioner's medical records at the motion to suppress to show that the police beat him while he was handcuffed, the post-conviction court found that the medical records were in line with the police version of the events – that the injuries were the result of dog bites when the dogs were released to apprehend the petitioner. Our review of the record supports this determination, and the petitioner has, therefore, failed to establish prejudice. We additionally note that pretrial counsel testified that he requested the medical records but did not receive them in time for the hearing. Pretrial counsel was, nonetheless, able to question the petitioner about the nature and cause of the injuries he received during his arrest. Accrediting pretrial counsel's testimony, as the post-conviction court did implicitly, the petitioner has failed to prove that pretrial counsel's conduct fell below an objective standard of reasonableness.

With regard to the petitioner's allegation that pretrial counsel failed to raise the issue of a warrantless arrest at the motion to suppress, the petitioner has failed to prove that pretrial counsel performed deficiently or that he was prejudiced. Pretrial counsel testified at the post-conviction hearing that he did not believe there was a warrant issued for the petitioner's arrest and that he did not ask any questions at the suppression hearing regarding "exigent circumstances or time circumstances." However, he explained that the focus of his basis for seeking suppression was that the petitioner's "will had been overborne." Thus, pretrial counsel apparently made a strategic decision to argue for suppression based on what he determined to be the most persuasive basis.

In any event, a challenge to a warrantless arrest would not have necessarily resulted in suppression of the petitioner's statement. Probable cause to make an arrest exists when "the facts and circumstances and reliable information known to the police officer at the time of the arrest '[are] sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense.'" State v. Johnson, 980 S.W.2d 414, 422-23

-13-

(Tenn. Crim. App. 1998) (quoting Beck v. Ohio, 379 U.S. 89, 91 (1964)). Regardless of whether probable cause exists, officers entry into a defendant's home without an arrest warrant or consent is a violation of the defendant's right under the Fourth Amendment to be secure against unreasonable seizures. See State v. Clark, 844 S.W.2d 597, 599 (Tenn. 1992) (stating that "'[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.'") (quoting Payton v. New York, 445 U.S. 573, 590 (1980)) (emphasis omitted).

However, an unconstitutional entry into a defendant's home does not trigger the exclusionary rule or otherwise require the suppression of the defendant's subsequent statement on Fourth Amendment grounds. In New York v. Harris, 495 U.S. 14, 21 (1990), the United States Supreme Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home, even though the statement is taken after an arrest made in the home in violation of Payton." See also State v. Jenkins, 81 S.W.3d 252, 264 (Tenn. Crim. App. 2002) (determining that the defendant's arrest was illegal but, adopting the reasoning of New York v. Harris to further determine that the police had probable cause to arrest the defendant and that the exclusionary rule did not require the suppression of the defendant's subsequent statement).

Here, the record indicates that the police had probable cause to arrest the petitioner based on information learned from Mardacy Greer after Greer was taken into custody. Therefore, even if the entry into the petitioner's sister's home was unlawful, such would not mandate the suppression of the petitioner's confession made later at the police station. The petitioner has failed to prove that pretrial counsel's failure to challenge the legality of his arrest caused him prejudice.

With regard to the petitioner's allegation that trial counsel was ineffective for calling the petitioner's mother to testify at trial because her testimony opened the door for the introduction of his prior juvenile record, the post-conviction court found that the petitioner provided no evidence that there was a reasonable probability that his mother's testimony affected the outcome of the trial.

The record shows that trial counsel called the petitioner's mother, Vandellar Malone, as a witness at trial. In response to questions by trial counsel, Ms. Malone testified that she had never known her son to carry a gun or to be a violent person in the past. Afterwards, the State, in a bench conference, argued that Ms. Malone's testimony opened the door for proof about the petitioner's record of violent offenses in juvenile court. The trial court agreed that the State could impeach Ms. Malone with her knowledge about the petitioner's juvenile

record.

Regardless of whether trial counsel's questioning Ms. Malone was deficient, we conclude that there is no reasonable probability that the result of the proceeding would have been different had trial counsel not asked Ms. Malone about the petitioner's history with guns and violence. The evidence of the petitioner's guilt was overwhelming. The petitioner admitted that he fired at the victim with a .40 caliber handgun during a drug deal that he facilitated between the victim and Mardacy Greer. The medical examiner determined that a .40 caliber bullet caused a fatal injury to the victim. The petitioner admitted that he owned and shot the victim with a .40 caliber Glock handgun. In light of this evidence, Ms. Malone's testimony about the petitioner's record of juvenile adjudications did not affect the outcome of the trial.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE